UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BORNALLAH WRIGHT,

               Plaintiff,

    -against-                        9:17-CV-0487 (LEK/TWD)

DAVID STALLONE, *et al.*,

               Defendants.

_____

**<u>MEMORANDUM-DECISION AND ORDER</u>**

## I.   INTRODUCTION

Plaintiff Bornallah Wright commenced this action by filing a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000 *et seq.*, asserting claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 ("Complaint"). These claims concern Plaintiff's ability to practice his religion at Cayuga Correctional Facility, where he is currently confined, by praying demonstrably in the prison's outdoor yard during recreation. <u>Id.</u>

Presently before the Court are three motions: Plaintiff seeks preliminary injunctive relief, Dkt. No. 9 ("Preliminary Injunction Motion"),[1] and the appointment of counsel, Dkt. No. 46 ("Counsel Motion"); defendants David Stallone, Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins, David Haggerty, Mary Coleman, and David Infantino (collectively, "State

_____

[1] Plaintiff's Preliminary Injunction Motion, styled as an Order to Show Cause, was docketed as an exhibit to the Complaint. <u>See</u> Dkt. No. 1-2. To avoid confusion, the Court directed the Clerk to file a copy of the Preliminary Injunction Motion as a separate docket entry. <u>See</u> Dkt. No. 8 ("Order") at 1.

Defendants") seek to dismiss the claims filed against them. Dkt. No. 38 ("Motion to Dismiss").

For the reasons stated below, Plaintiff's Preliminary Injunction Motion is granted in part and

denied in part; his Counsel Motion is granted; and State Defendants' Motion to Dismiss is

granted in part and denied in part.

## II.    BACKGROUND

### A.  Relevant Facts

Plaintiff alleges that he is a practicing Muslim who is required by his faith to pray at

specific times of day. Compl. at 5. Sometimes these prayers ("commonly known as salaah or

salaat") must be performed during recreation, when Plaintiff is outside in the prison's yard. Id.

Nevertheless, he and other Muslim inmates were "denied [the] ability to go off to an unoccupied

area of the yard to pray [their] salaah." Id. at 6. Plaintiff and the other inmates were informed that

a designated area in the yard for prayer could only be used by one inmate—Aurel Smith—in

accordance with the terms of an agreement Smith had reached with DOCCS after nine years of

litigation. Id. at 6.[2] DOCCS staff also advised Plaintiff and other inmates that they "would have

to file a suit, too" if they wanted accommodations for their religious beliefs. Id.[3]

---

[2] Among the documents submitted as exhibits to the Complaint is an unsigned draft "Stipulation and Order of Discontinuance Pursuant to Rule 41(A)" bearing the caption of Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Oct. 29, 2007). Dkt. No. 1-1, at 1–7. A similar Stipulation and Order, signed by the parties and District Judge Mordue, was filed in that action on March 24, 2016. See Stipulation and Order of Discontinuance, Smith v. Artus, No. 07-CV-1150 (N.D.N.Y. Mar. 24, 2016), ECF No. 188. The terms and conditions under which Smith is permitted to engage in demonstrative prayer in any DOCCS facility are set forth in paragraph 10 of the Stipulation and Order. Id. at 4–5.

[3] According to Plaintiff, Smith advised defendant David Stallone, Cayuga's superintendent, that a "restriction to others' ability to engage in salaah was not part of Smith's settlement nor an intended effect thereof." Compl. at 7. As alleged, Stallone told Smith that "others will have to still file suits in order to get a court order or settlement." Id.

On August 18, 2016, Plaintiff filed an inmate grievance complaining that he was not allowed to pray his salaah in the yard. Id. at 6; see also Dkt. No. 1-1, Ex. 6 ("August Grievance"). Plaintiff requested permission to pray in the yard during recreation, as Smith was permitted to do. Aug. Grievance at 1. The Inmate Grievance Review Committee ("IGRC") denied Plaintiff's request. Compl. at 5; Aug. Grievance at 2. In support of that denial, the IGRC provided Plaintiff with a copy of a memorandum dated March 22, 2016, written by Captain J. Rocker and addressed to Cayuga's security staff regarding Smith's exclusive right to pray demonstrably in the yard. Dkt. No. 1-1, Ex. 7. The memorandum states as follows:

> The results of a recent law-suit filed by Inmate Smith, A. 02A6279 have granted this inmate the right to practice his religion (Islam) by praying in the yard during open recreation.
>
> Effective Wednesday March 24, 2016 Inmate Smith will be allowed to pray in the yard. There is a white painted area 5' by 5' area in the southwest corner near the weight fence. This area is the only area in which Inmate Smith will be allowed to pray.
>
> Inmate Smith will be the **ONLY INMATE** who will be allowed to pray in the yard.

Id. Plaintiff's appeal of the IGRC decision was denied at the facility level on August 29, 2016. Compl. at 6; Dkt. No. 1-1, Ex. 8. The Central Office Review Committee ("CORC") issued a decision dated March 22, 2017, also denying Plaintiff's appeal. Dkt. No. 1-1, Ex. 9 ("CORC notes that a recent settlement agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there.").[4]

---

[4]    Inmate Jimir McMillan filed a similar grievance, dated May 5, 2016, complaining that only Smith was allowed to pray in the yard. Compl. at 5; Dkt. No. 1-1, Exs. 2–5. The IGRC denied the grievance and referenced the same memorandum written by Captain Rocker. Dkt. No. 1-1, Ex. 3. On May 25, 2016, Stallone denied McMillan's appeal. Dkt. No. 1-1, Ex. 4. CORC upheld the denial on October 19, 2016, stating that "CORC notes that a recent settlement

Plaintiff commenced this action on May 4, 2017. Compl. On August 24, 2017, officials at Cayuga began to allow Plaintiff to pray demonstrably in the outdoor yard during recreation in a similar fashion to Smith. Dkt. No. 31 ("Preliminary Injunction Opposition") at 1. That is, Plaintiff could pray "in a designated area in the Southwest corner of the yard." Id. at 2. On January 10, 2018, pursuant to a request from the Court, Dkt. No. 57, State Defendants clarified that Plaintiff and Smith could pray simultaneously, but each designated area is separated by fifteen feet, Dkt. No. 58 ("Status Report") at 1. State Defendants also reported that officials at Cayuga had designated a third area in the yard for prayer, and that any Muslim inmate had the right to use the designated areas—not just Plaintiff and Smith. Id.[5] Each designated area could be used by only one inmate at a time, but a maximum of three inmates could pray simultaneously. Id. State Defendants did not explain why Cayuga officials altered its policy regarding demonstrable prayer with respect to Plaintiff or other Muslim inmates.

Based upon the foregoing, Plaintiff claims that his right to practice his religion has been and continues to be impermissibly burdened by State Defendants in violation of the First Amendment and RLUIPA. Compl. at 8–9. Plaintiff also asserts a claim for the violation of his rights protected under the Equal Protection Clause of the Fourteenth Amendment. Id. at 10. He seeks an award of monetary damages and injunctive relief. Id. at 11.

---

agreement permits only one specific inmate to pray in a designated area of the yard during recreation, and that other inmates are not allowed to pray there." Dkt. No. 1-1, Ex. 5.

[5] Plaintiff filed a response to the Status Report on January 24, 2018. Dkt. No. 61 ("Status Report Opposition"). In this document, Plaintiff disputes State Defendants' characterization of Cayuga's new rules regarding prayer and states that Cayuga officials have not announced that all Muslims have the right to pray demonstrably in the recreation yard. Status Report Opp'n at 2. As described below, this factual dispute does not affect the outcome of the Court's decision.

**B. Procedural History**

Plaintiff commenced this action on May 4, 2017. Compl. In a Decision and Order dated July 28, 2017, Dkt. No. 8 ("Order"), the Court considered the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. The Order dismissed a number of defendants and ordered the remaining defendants to respond to the Complaint and Preliminary Injunction Motion. Order at 12–13. State Defendants filed their opposition to the Preliminary Injunction Motion on October 6, 2017, Prelim. Inj. Opp'n, to which Plaintiff replied on November 13, 2017, Dkt. No. 48 ("Preliminary Injunction Reply"). On October 23, 2017, State Defendants filed their Motion to Dismiss; Plaintiff responded in opposition on January 16, 2018, Dkt. No. 59 ("Dismiss Opposition"), to which State Defendants replied on January 23, 2018, Dkt. No. 60 ("Dismiss Reply"). Finally, Plaintiff filed his Counsel Motion on October 30, 2017. Counsel Mot.

**III.    LEGAL STANDARD**

**A. Motion to Dismiss**

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more

5

than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing

Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require

'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer

more than the possibility of misconduct based on the pleaded facts, the pleader has not

demonstrated that he is entitled to relief, and the action is subject to dismissal. Id. at 678–79.

Nevertheless, "[f]act-specific question[s] cannot be resolved on the pleadings." Anderson News,

L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (second alteration in original)

(quoting Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001)). Presented with "two plausible

inferences that may be drawn from factual allegations," a court "may not properly dismiss a

complaint that states a plausible version of the events merely because the court finds a different

version more plausible." Id.

### B. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Gen.

Mills, Inc. v. Chobani LLC, 158 F. Supp. 3d 106, 114 (N.D.N.Y. 2016) (quoting Winter v. Nat.

Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). Generally, "[a] plaintiff seeking a preliminary

injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest." Winter, 555 U.S. at 20.

While a district court typically has wide discretion in determining whether to grant

preliminary injunctive relief, Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 511

(2d Cir. 2005), "[i]n the prison context, a request for injunctive relief must always be viewed

with great caution so as not to immerse the federal judiciary in the management of [] prisons,"
Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997). "Under the Prison Litigation Reform
Act ("PLRA"), preliminary injunctive relief in any civil action with respect to prison conditions
must be narrowly drawn, extend no further than necessary to correct the harm, and be the least
intrusive means necessary to correct that harm." V.W. v. Conway, 236 F. Supp. 3d 554, 581
(N.D.N.Y. 2017) (citing 18 U.S.C. § 3626(a)(2)). A court must give "substantial weight" to any
adverse impact on public safety the injunctive relief might have. § 3626(a)(1)(A).

### C. Motion to Appoint Counsel

In Terminate Control Corp. v. Horowitz, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit
reiterated the factors that a court must consider in ruling upon a motion for the appointment of
counsel. As a threshold matter, a court must first determine whether the plaintiff's position seems
likely to be of substance. Id. at 1341 (citing Hodge v. Police Officers, 802 F.2d 58, 61
(2d Cir. 1986)). If the claim meets this requirement, a court should then consider a number of
other factors in making its determination, including the plaintiff's ability to investigate crucial
facts and the complexity of the legal issues presented by the case. Id. Of these criteria, the most
important is the merits, i.e., "whether the indigent's position was likely to be of substance."
McDowell v. State of New York, No. 91-CV-2440, 1991 WL 177271, at *1 (S.D.N.Y.
Sept. 3, 1991) (quoting Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989)).

## IV. DISCUSSION

### A. Motion to Dismiss

State Defendants move to dismiss the Complaint on two grounds: First, that they are
sheltered from liability by the doctrine of qualified immunity, Dismiss Mot. at 2–5, and, second,

7

that State Defendants were not personally involved in the alleged constitutional and statutory violations, id. at 5–7. The Court notes that State Defendants' cursory submission does not distinguish between the multiple violations that Plaintiff has alleged or the different types of relief that Plaintiff sought; Plaintiff has alleged violations of his rights guaranteed by the First Amendment, RLUIPA, and the Fourteenth Amendment, and he seeks monetary damages and injunctive relief. These distinctions make a difference, as the Court will explain below.

### 1. Qualified Immunity

The defense of qualified immunity entitles public officials to freedom from suit for monetary damages, as a result of the consequences of the performance of their discretionary duties, when "their conduct does not violate clearly established rights of which a reasonable person would have been aware." Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir. 2013).[6] Qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving that the privilege applies. Coolick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012).

"The determination of qualified immunity depends both on the specific facts of an official's actions—e.g., 'what situation confronted [him], what acts he performed, and his motivation in performing those acts'—and on the clarity of the legal rules governing that particular conduct." Village of Freeport v. Barrella, 814 F.3d 594, 609 (2d Cir. 2016) (quoting Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)). In deciding whether an officer's

---

[6] The doctrine of qualified immunity does not "bar any claim for equitable relief." Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) (citing Pearson v. Callahan, 555 U.S. 223, 242–43 (2009)), vacated on other grounds, 522 F. App'x 82 (2d Cir. 2013). There is no dispute that Plaintiff has moved for injunctive relief. Compl. at 13; Prelim. Inj. Mot. at 1. Therefore, State Defendants' argument that "the complaint should be dismissed in its entirety" because of the doctrine of qualified immunity is misplaced. Dismiss Mot. at 5.

actions were objectively reasonable in light of existing law, "the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." Zalaski, 723 F.3d at 389 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

### a. Free Exercise Claim

State Defendants are correct that, as a general matter, a prisoner's right to pray demonstrably in the recreation yard—whether alone or in congregate—was not clearly established at the time Plaintiff was prevented from doing so. Dismiss Mot. at 2–5. Although numerous prisoners have raised this claim in this Circuit since the late 1970s, no court has clearly established that prisoners have a right to pray demonstrably in the recreation yard by oneself or in small groups. See Shabazz v. Coughlin, 852 F.2d 697, 700–01 (2d Cir. 1988) ("However, as the district court conceded, this court had not then nor since directly addressed the constitutionality of restrictions on group prayer and prayer in prison yards."); Smith v. Artus, No. 07-CV-1150, 2015 WL 9413128, at *11–12 (N.D.N.Y. Dec. 22, 2015) ("Smith II") (finding that defendants were entitled to qualified immunity for preventing plaintiff from praying demonstrably in the prison's recreation yard).

However, Plaintiff is also correct that his situation is not analogous to previous cases in which prisoners challenged DOCCS's policy regarding demonstrable prayer in the recreation yard. Dismiss Opp'n at 6–8. Most importantly, between March 24, 2016 and August 23, 2017, Cayuga officials permitted Smith to pray demonstrably in the recreation yard *and yet* denied Plaintiff the ability to do so. This inconsistent treatment should have raised significant concerns

9

among prison officials regarding the alleged penological interests supporting the policy of banning individual, demonstrable prayer. See Smith v. Artus, No. 07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sept. 30, 2010) ("Smith I") ("The defendants in this case allege that there are concerns for security, as well as staffing and fiscal concerns, associated with accommodating plaintiff's request to pray demonstratively during the recreation period."), vacated on other grounds, 522 F. App'x 82 (2d Cir. 2013). If Smith could pray demonstrably in the recreation yard, why couldn't Plaintiff? What legitimate penological interests did banning Plaintiff (and other inmates) from praying demonstrably in the recreation yard serve? State Defendants make no attempt to justify this inconsistent treatment between Smith and the other inmates.

As discussed more fully below, to defend against a First Amendment free exercise claim brought by a prisoner, prison officials bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Salahuddin v. Goord, 467 F.3d 263, 275 (2d Cir. 2006). Courts in this Circuit have highlighted the problem that inconsistent treatment of inmates creates for prison officials in their attempt to justify burdens on prisoners' religious exercise. See, e.g., Aziz v. Le Fevre, 642 F.2d 1109, 1111 (2d Cir. 1981) ("We think it would have some bearing upon the ultimate resolution of the constitutional question if, in fact, the state policy as set forth in Directive No. 4203 is not followed at Green Haven, and hence is not a 'policy' at all."); Pilgrim v. Artus, No. 07-CV-1001, 2010 WL 3724883, at *11 (N.D.N.Y. Mar. 18, 2010), adopted by, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Also, Directive #4914 allows all inmates to grow

10

their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear

their hair in a 'Afro-natural' style. Thus, DOCS affords a degree of leeway with respect to

inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by

non-Rastafarian prisoners."); <u>Salahuddin v. Coughlin</u>, 999 F. Supp. 526, 536 (S.D.N.Y. 1998)

(describing inconsistent application of DOCCS policy toward congregate religious services in

multiple prisons, which "creates an issue of fact as to . . . the legitimacy of the penalogical [*sic*]

interest asserted").

At this early stage in the litigation and absent any attempt from State Defendants to

justify the inconsistent treatment of Smith and Plaintiff, the Court cannot hold that a reasonable

prison official would have understood such treatment to be consistent with the First Amendment.

If Cayuga officials had no penological interest in denying Smith the ability to pray demonstrably

in the outdoor yard during recreation, then there may have been no penological interest in

denying Plaintiff the same ability. Moreover, it was clearly established law in 2016 that prison

officials needed *some* legitimate penological interest to justify the burdening of an inmate's

sincere religious beliefs. <u>See</u> <u>Ford v. McGinnis</u>, 352 F.3d 582, 597 (2d Cir. 2003) ("We find that

prior cases make it sufficiently clear that absent a legitimate penological justification, which for

present purposes we must assume defendants were without, prison officials' conduct in denying

Ford a feast imbued with religious import was unlawful."). Therefore, at this time, State

Defendants are not entitled to qualified immunity regarding Plaintiff's First Amendment Claim.

### b.  RLUIPA Claim

Plaintiff may not recover money damages pursuant to RLUIPA against State Defendants

either in their individual or official capacities. <u>Smith II</u>, 2015 WL 9413128, at *12 ("RLUIPA

does not authorize claims for money damages against state officials in their official capacities

and does not create a private right of action against them in their individual capacities."

(citing Sossamon v. Texas, 563 U.S. 277, 280 (2011))). However, the doctrine of qualified

immunity does not preclude Plaintiff from receiving injunctive relief against State Defendants in

their official capacities pursuant to RLUIPA. Id. at *12–13.

c.  Equal Protection Claim

State Defendants do not make any specific arguments in support of their position that they

are entitled to qualified immunity regarding Plaintiff's Equal Protection claim. Dismiss Mot.

at 4–5. The constitutional questions raised by DOCCS's unequal treatment of Plaintiff and his

fellow prisoner, Artus Smith, are distinct from the constitutional questions surrounding

Plaintiff's alleged right to pray in the recreation yard pursuant to the First Amendment. Since

qualified immunity is an affirmative defense, and, as such, defendants bear the burden of proving

that the privilege of qualified immunity applies, Coolick, 699 F.3d at 219, the Court will not

dismiss Plaintiff's Equal Protection claim for monetary damages absent an argument from State

Defendants.

2.  Personal Involvement

State Defendants also move to dismiss Plaintiff's claims based on the requirement that

"a plaintiff must show some 'tangible connection' between the unlawful conduct and the

defendant[s].'" Dismiss Mot. at 5 (quoting Jackson v. Gunsalus, No. 16-CV-647,

2016 WL 4004612, at *3 (N.D.N.Y. June 24, 2016), adopted by 2016 WL 3983635

(N.D.N.Y. July 25, 2016)). "It is well settled in this circuit that 'personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

12

§ 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of

Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere

"linkage" to the unlawful conduct through "the prison chain of command" is insufficient to show

his or her personal involvement in that unlawful conduct. Richardson v. Goord, 347 F.3d

431, 435 (2d Cir. 2003); accord Wright, 21 F.3d at 501. In other words, supervisory officials may

not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d

72, 74 (2d Cir. 1996). Rather, supervisory personnel may be considered "personally involved"

only if they: (1) directly participated in the alleged constitutional violation, (2) failed to remedy

that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a

policy or custom under which the violation occurred, (4) were grossly negligent in managing

subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of

inmates by failing to act on information indicating that the violation was occurring. Colon v.

Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24

(2d Cir. 1986)).[7]

     However, "the 'personal involvement requirement does *not* apply to bar actions . . . for

injunctive relief against a state official.'" Brisco v. Rice, No. 11-CV-578, 2012 WL 253874,

at *4 (E.D.N.Y. Jan. 27, 2012) (quoting Marinaccio v. Boardman, No. 02-CV-831,

2005 WL 928631, at *9–10 (N.D.N.Y. Apr. 19, 2005) (emphasis in original)); see also

---

     [7] There is disagreement among district courts in this Circuit as to whether all of the
Colon factors are still valid following the Supreme Court's decision in Ashcroft v. Iqbal,
556 U.S. 662 (2009). See, e.g., Dilworth v. Goldberg, No. 10-CV-2224, 2011 WL 3501869
at *17 (S.D.N.Y. Jul. 28, 2011) (collecting cases), adopted by 2011 WL 4526555
(Sept. 30, 2011). "[I]n the absence of contrary direction from the Second Circuit, the Court will
continue to apply those factors." Jackson v. Goord, No. 06-CV-6172, 2011 WL 4829850, at *9
(W.D.N.Y. Oct. 12, 2011).

Courts v. Coombe, No. 95-CV-2350, 1996 WL 312357, at *2 (S.D.N.Y. June 11, 1996)

("Personal involvement . . . is only required where the complaint seeks monetary damages, not

where injunctive or declaratory relief is sought."). Instead, in order to state a claim seeking

injunctive relief, a plaintiff must demonstrate that the defendant "has a direct connection to,

or responsibility for, the alleged illegal action." Reynolds v. Blumenthal, No. 04-CV-218,

2006 WL 2788380, at *7 (D. Conn. Sept. 26, 2006) (citing Ex parte Young, 209 U.S. 123, 157

(1908)); see also Pugh v. Goord, 571 F. Supp. 2d 477, 517 (S.D.N.Y. 2008) ("Courts in this

Circuit have since applied the holding in Ex parte Young to require only that a defendant have a

'connection' with the act, and not more.") (citing In re Dairy Mart Convenience Stores, Inc.,

411 F.3d 367, 372–73 (2d Cir. 2005)).

### a.  David Stallone

Superintendent Stallone is a supervisory official at Cayuga, and therefore Plaintiff must

allege his personal involvement pursuant to Colon with respect to Plaintiff's First Amendment

and Equal Protection claims for monetary damages. Plaintiff alleges that Stallone told Smith that

any Muslim inmate who wishes to pray demonstrably in the recreation yard "would have to file

suits [sic] in order to get similar accommodation." Compl. at 6. Plaintiff also presents evidence

that Stallone denied an inmate grievance appeal, similar to the one filed by Plaintiff, and stated

that only Smith is permitted to pray demonstrably in the recreation yard. Dkt. No. 1-1, Ex. 4.

Stallone did not deny Plaintiff's grievance appeal; a designee did. Dkt. No. 1-1, Ex. 8.

Courts in this Circuit are split regarding the extent of involvement that a plaintiff must

allege in order to establish a supervisory defendant's requisite personal involvement. Compare

McClenton v. Menifee, No. 05-CV-2844, 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006)

("[A] supervisor's mere denial of a grievance is insufficient to establish personal

involvement . . ."), with Madison v. Mazzuca, No. 02-CV-10299, 2004 WL 3037730, at *10

(S.D.N.Y. Dec. 30, 2004) ("[P]ersonal involvement is present where a supervisory official

reviews a prisoner's grievance with respect to a constitutional violation and decides against

taking any corrective action."). With regard to Stallone, the Court does not need to take sides in

this split, because Plaintiff has alleged that Stallone—outside of the context of grievances—was

aware of the alleged violation of Plaintiff's rights, had the authority to remedy such violation,

and failed to do so. At this early stage in the litigation, such allegations are sufficient to establish

personal involvement under the second prong of Colon. See Saxon v. Attica Med. Dep't,

468 F. Supp. 2d 480, 483 (W.D.N.Y. 2007) (denying a motion to dismiss claims against prison

superintendent, even though "allegations . . . may be characterized as thin").

    With regard to Plaintiff's motion for prospective injunctive relief, Stallone—as the

superintendent of Cayuga—has a direct connection to, and is responsible for, the protection

of Plaintiff's constitutional and statutory rights. E.g., Jacobson v. Coughlin, 523 F. Supp.

1247, 1249 (N.D.N.Y. 1981) (denying a motion to dismiss claims for injunctive relief against

prison superintendent regarding plaintiff's special housing confinement). Plaintiff also has

specifically alleged that Stallone was aware of and failed to remedy the alleged constitutional and

statutory violations at issue in this case. Therefore, Plaintiff's claims against him for injunctive

relief will not be dismissed.

### b.  Other State Defendants

    Plaintiff presents evidence that the other State Defendants—Hale, Schadewald, Korb,

Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino—were members of either the IGRC

or CORC and denied multiple grievances and appeals regarding inmates' ability to pray demonstrably in Cayuga's yard during recreation. Dkt. No. 1-1, Exs. 2–7. Although, as mentioned above, district courts in this Circuit are split regarding the level of involvement represented by a denial of an inmate grievance, the majority of courts have held "that an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights." Vogelfang v. Capra, 889 F. Supp. 2d 489, 503–04 (S.D.N.Y. 2012) (citing Odom v. Calero, No. 06-CV-15527, 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008)); see also Rogers v. Artus, No. 13-CV-21, 2013 WL 5175570 at * 3 (W.D.N.Y. Sept. 11, 2013) ("The denial, or affirmance of a denial, of a grievance by a Superintendent or other supervisory official is insufficient, without more, to create personal involvement in alleged violations." (citing Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) and James v. Poole, No. 06-CV-6007, 2013 WL 132492 at *7 (W.D.N.Y. Jan. 9, 2013))). In addition, Plaintiff has not alleged that any of these defendants are ultimately responsible for the protection of Plaintiff's constitutional and statutory rights, as defendant Stallone is. Therefore, defendants Hale, Schadewald, Korb, Figueroa, Noeth, Perkins, Haggerty, Coleman, and Infantino must be dismissed.[8]

### B. Preliminary Injunction

Plaintiff seeks injunctive relief with regard to two activities: First, to pray demonstrably in the recreation yard on his own, and, second, to pray demonstrably in the recreation yard in a

---

[8] This analysis also applies to defendant Joseph Noeth, who was a member of CORC but was not properly served the Complaint because of a typographical error. Dkt. No. 53. In addition, the three named defendants who are inmates—David Jackson, Willie Brown, Jr., and Todd Gage—must be dismissed because they are not state actors. Lewis v. Doe, No. 13-CV-3190, 2013 WL 5923723, at *1 (E.D.N.Y. Oct. 31, 2013).

group of two or three inmates. Prelim. Inj. Mot. at 1. Plaintiff seeks this relief for himself and

"similarly situated Muslim prisoners in custody of [] DOCCS." Id. However, as a pro se litigant,

Plaintiff "has no authority to appear as an attorney for others." Lebron v. Armstrong, 289 F.

Supp. 56, 59 (D. Conn. 2003) (citing Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1308

(2d Cir. 1991)). Plaintiff "may seek relief on behalf of himself only." Id. Therefore, his request

for relief with respect to other inmates is denied.

### 1. Individual, Demonstrable Prayer in the Recreation Yard

#### a. Mootness

State Defendants argue that Plaintiff's request for injunctive relief is moot, and therefore

the Preliminary Injunction Motion should be denied, because Plaintiff is now able to pray

demonstrably in Cayuga's recreation yard. Prelim. Inj. Opp'n at 1. However, "[i]t is well settled

that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court

of its power to determine the legality of the practice.'" Friends of the Earth, Inc. v. Laidlaw

Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc.,

455 U.S. 283, 289 (1982)). Instead, a defendant must meet the "heavy burden of persua[ding]"

the Court that "subsequent events made it absolutely clear that the allegedly wrongful behavior

could not reasonably be expected to recur." Id. (quoting United States v. Concentrated Phosphate

Exp. Assn., 393 U.S. 199, 203 (1968)).

Here, State Defendants have not met this burden. They do not deny that Plaintiff is able

to pray demonstrably only because he filed suit in federal court; there is no indication that, absent

this litigation, Cayuga officials would have altered its previous policy. Moreover, State

Defendants have not made any indication that DOCCS has reconsidered its "departmental

17

directive prohibiting demonstrative prayer in the [recreation] yard." Dismiss Mot. at 4. In short, State Defendants have not demonstrated that it is absolutely clear that Plaintiff will not be denied the ability to pray demonstrably in Cayuga's yard during recreation in the future. Accordingly, Plaintiff's request for relief is not moot.

### b.  Likelihood of Success on the Merits

In determining whether Plaintiff has established a likelihood of success on the merits, the Court looks to whether the evidence presented demonstrates that he is likely to prevail at trial on a claim concerning the conduct complained of—in this case, the denial of his ability to pray demonstrably on his own in Cayuga's recreation yard. To succeed on a First Amendment free exercise claim, "the prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274–75. Defendants then bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Id. at 275.

Although State Defendants have not presented an argument on the merits in opposition to the Preliminary Injunction Motion, it is improbable that they would question the sincerity of his religious belief or the fact that the denial of his ability to pray demonstrably in the recreation yard substantially burdens those beliefs. Judge Mordue denied DOCCS's motion for summary judgment advancing such arguments with regard to Smith in 2015. See Smith II, 2015 WL 9413128 at *9 ("The Court rejects defendants' argument that they are entitled to summary judgment dismissing plaintiff's free exercise claim on the ground that the challenged policy does not impose a substantial burden on his sincerely held religious beliefs as a matter of law."). It is also improbable that State Defendants would present an argument that Plaintiff's

18

ability to pray demonstrably threatens legitimate penological interests, since Cayuga now permits Plaintiff—and apparently all other Muslim inmates—to pray demonstrably in the yard during recreation. Status Report at 1.

In sum, Plaintiff is likely to succeed at trial on his claim that denying him the ability to pray demonstrably in the recreation yard at Cayuga violates his First Amendment rights.

### c. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." Elrod v. Burns, 427 U.S. 347 (1976). Because Plaintiff alleges that the deprivation of his First Amendment right to the free exercise of religion resulted directly from prison officials' actions, "irreparable harm may be presumed." Keesh v. Smith, No. 04-CV-779, 2006 WL 516793 at *3 (N.D.N.Y. Mar. 2, 2006).

### d. Balance of the Equities

In determining whether the balance of equities tips in Plaintiff's favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)). Here, the hardship faced by Plaintiff is potentially substantial: the loss of his right to exercise his religious beliefs. On the other side, the hardship faced by State Defendants is minimal, since Cayuga now permits Plaintiff to pray demonstrably in its recreation yard. State Defendants make no argument that maintaining this new policy during the course of litigation would impose a hardship on prison administration.

19

e.  Public Interest

Finally, the Court finds that the issuance of the requested relief serves the public interest. While the Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves, N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013), that is not the case here. "[S]ecuring First Amendment rights is in the public interest," and it is decidedly against the public interest to permit the enforcement of an unconstitutional policy or law. Id.

Since Plaintiff has established each of the factors required by Winter, the Court will issue a preliminary injunction with regard to individual, demonstrable prayer in Cayuga's outdoor yard during recreation.

2.  *Congregate, Demonstrable Prayer in the Recreation Yard*

Plaintiff's request for injunctive relief regarding his ability to pray in congregate with other inmates is factually distinct from his request for individual prayer. State Defendants have not permitted Plaintiff or other inmates to pray in congregate, and State Defendants maintain that congregate prayer would present serious security threats to prison administration. See Dkt. No. 31-1 ("Kelly Declaration") ¶¶ 20–30. Plaintiff is correct to highlight the apparent contradictions in some of these alleged security threats. E.g., Prelim. Inj. Mot. Reply ¶¶ 36–37. For example, State Defendants do not sufficiently explain why groups of two or three inmates are permitted to gather in the recreation yard for conversation but are not allowed to gather for demonstrable prayer. The fact that Muslims' demonstrable prayer could be "used as code," Kelly Decl. ¶ 25, does not explain why such prayer is different from other activities, such as

normal conversation or hand gestures, that may contain "codes" but which are permitted in the recreation yard among two or three inmates.

But at this early stage in the litigation, the Court cannot find that Plaintiff is likely to succeed on the merits regarding this claim. Courts in this Circuit have upheld prison officials' consistent application of bans on congregate, demonstrable prayer under factually similar circumstances. See, e.g., Withrow v. Bartlett, 15 F. Supp. 2d 292, 296 (W.D.N.Y. 1998) ("I find that defendants had a legitimate penological interest in maintaining security, and that this interest was rationally related to their enforcement of policies that prohibit group demonstrative prayer in Elmira's recreational yard."). Moreover, given the direction from Congress that, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution," Fisher, 981 F. Supp. at 167, the Court will not alter the status quo at Cayuga at this point. Accordingly, Plaintiff's request for injunctive relief with respect to congregate, demonstrable prayer is denied.

### C.  Motion to Appoint Counsel

As discussed above, Plaintiff's claims are clearly "of substance." Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986). The heart of Plaintiff's lawsuit—whether prisoners have a First Amendment right to pray demonstrably in an outdoor yard during recreation—has perplexed courts in this Circuit since the late 1970s. E.g., Aziz, 642 F.2d at 1111. The large number of similar lawsuits that have ended before the merits were reached strongly suggests that the legal issues are complicated and Plaintiff would benefit from legal representation. In addition, litigating this lawsuit properly will benefit from extensive factfinding, particularly with regard to the practices at other prison facilities in New York. Since Plaintiff has been unable to receive

legal representation on his own, Counsel Mot. at 1, the Court grants Plaintiff's Counsel Motion

and pro bono counsel will be appointed.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 38) is **GRANTED in part** and

**DENIED in part**; the Motion is **GRANTED** as to Plaintiff's claim for monetary damages

pursuant to RLUIPA against all Defendants; the Motion is **GRANTED** as to all of Plaintiff's

claims against defendants Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins,

David Haggerty, Mary Coleman, and David Infantino; the Motion is otherwise **DENIED**; and

it is further

**ORDERED**, that Jeffrey Hale, T. Schadewald, E. Korb, Daniel Figueroa, Ora Perkins,

David Haggerty, Mary Coleman, David Infantino, Joseph Noeth, David Jackson, Willie Brown,

Jr., and Todd Gage are **DISMISSED** as defendants in this action; and it is further

**ORDERED**, that Plaintiff's Preliminary Injunction Motion (Dkt. No. 9) is **GRANTED**

**in part** and **DENIED in part**; and it is further

**ORDERED**, that each time Plaintiff is permitted to attend recreation in Cayuga's

outdoor yard, Plaintiff shall be permitted to participate in individual, demonstrable prayer

absent extraordinary circumstances; and it is further

**ORDERED**, that Plaintiff's Counsel Motion (Dkt. No. 46) is **GRANTED**; and it is

further

22

**ORDERED**, that the Clerk of the Court is instructed to appoint Lisa Anne Proskin, whose business address is 423 Loudon Road, Albany, New York, 12211, to serve as *pro bono* counsel and to faithfully and diligently represent Plaintiff in this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        January 31, 2018
                     Albany, New York

Lawrence E. Kahn
U.S. District Judge

23